Becker's Estate

*Larzelere & Wright,* and *James P. Gilliland,* for accountants.

*High, Dettra & Swartz, James M. Love,* and *Rambo & Mair,* for claimants.

HOLLAND, P. J., July 25, 1941.—Decedent died on September 12, 1931, leaving a will dated December 21,

1929, and two codicils, dated February 19, 1930, and April 8, 1931, all duly probated on September 24, 1931, on which the present letters were granted to accountants.

The executors' first account was filed on October 31, 1932, and showed a balance of $2,892.43 for distribution. Preferred claims, amounting to $1,226.65, were paid in full; general claims, totaling $58,665.55, received a small dividend. This account included rents collected by accountants on real estate owned by decedent in Ardmore, Lower Merion Township, this county.

In 1934, a mortgage of $50,000 given by decedent on part of the real estate he owned at his death was foreclosed. In 1936, accountants, with leave of court obtained upon petition, sold another part to pay creditors who had obtained liens. The proceeds thereof are the subject matter of another account, adjudicated concurrently. In 1940, Frank William Carr, one of the several annuitants named in the will, cited the executors to show cause why they should not sell the remaining real estate to pay legacies charged thereon. Accountants' answer to that petition averred receipt of an offer for the real estate, and joined in the prayer thereof. Indemnity Insurance Company of North America, creditor by virtue of assignment from the trustee in bankruptcy of Harry J. Rittenhouse, in answer to the petition, denied the alleged expiration of all liens and averred a validly subsisting lien on the real estate. By decree entered April 12, 1940, in that proceeding, the court ordered the residuary devisee under the will to pay the legacies and annuities and, if this be not done in 15 days, the executors to institute proceedings for the sale of the real estate. Determination of the question whether the annuitants or the creditors were entitled was deferred until an account of the proceeds realized could be filed. The residuary devisee having failed to comply with the order, the executors duly petitioned for leave to sell the real estate at private

sale, for payment of annuities and legacies. The final decree, entered June 10, 1940, directed the executors to account for the proceeds.

The account was filed on October 26, 1940, and shows a balance of $2,148.72 in cash, for distribution.

It is now to be determined whether the proceeds of the sale of the real estate, being the balance for distribution, shall be awarded to the beneficiaries or to creditors.

The petition for adjudication sets forth three claims of creditors, none of which is admitted by accountants to be properly allowable, on the ground that they were not liens upon the real estate on June 10, 1940, when it was sold. The second and third claimants each contest the other two claims.

The first claim is that of Samuel L. McCracken, for $770.79. A verdict was entered for claimant and against decedent in his lifetime, in an action of trespass in the court of common pleas of this county. Judgment was entered on the verdict as of November term, 1929, no. 324, for $800. A claim in the full amount of the judgment was allowed at the audit of the first executors' account, and claimant was awarded a pro rata share of the balance for distribution, namely $29.21, leaving the amount presently claimed still due. As this claimant did not appear at the audit, either in person or by counsel, notwithstanding actual notice, the claim is disallowed for want of proof.

The second claim is that of Indemnity Insurance Company of North America, already referred to above, for $4,817.49. This claimant, as assignee of John W. Phillips, trustee in bankruptcy of Harry J. Rittenhouse, brought an action in assumpsit against decedent's executors in the court of common pleas of this county, as of April term, 1932, no. 94, for $5,000. The action was brought on April 9, 1932, and was duly indexed in the judgment index against decedent and against the executors. There is no dispute as to compliance with all requirements of section 15($a$) of the

Fiduciaries Act of June 7, 1917, P. L. 447, insofar as the bringing of the action, or the indexing in the judgment index, is concerned.

No further step in this action was ever taken in the common pleas. It was not "duly prosecuted to judgment" in that court, as provided by section 15 (*a*) of the Fiduciaries Act, in the strict sense which implies a judgment, either by default or on a verdict, entered in the judgment docket in the prothonotary's office and indexed in the judgment index. In permitting the action to stop at that point, claimant was not negligent or indifferent to the requirements of the Fiduciaries Act. It relied on the amendment to section 15 (*a*) by the Act of June 7, 1919, P. L. 412, whereby an action such as this "shall be deemed to have been duly prosecuted to judgment if award in favor of the plaintiff be made by . . . the orphans' court, or if the claim be included in a schedule of distribution and the latter be confirmed by the court." The first executors' account was filed less than seven months after the action was brought. Not only was the claim allowed and awarded in the adjudication upon the account, but it was included in the schedule of distribution which was directed by the adjudication and was approved by the court. Of course, the amount awarded was but the pro rata share of a general creditor, namely $182.51.

It is not denied that claimant did all that was necessary to obtain a valid lien on decedent's real estate in the first instance, by the action brought on April 9, 1932. However it is contended that the lien thus obtained expired on September 11, 1937, six years after decedent's death, because it was not revived by scire facias within the five-year period.

Claimant admits that if its lien had arisen by virtue of its action in the common pleas, perfected by the entry of judgment in the common pleas, then the lien could have been continued beyond September 11, 1937, only by scire facias issued as provided by section 15 (*a*) of the Fiduciaries Act. But claimant contends that

since the requirement that its action be "duly prosecuted to judgment" was complied with by award of this court, instead of judgment of the common pleas, no revival proceedings were necessary to continue the lien, because section 15(a) does not require any in such cases.

Counsel for claimant states that the question is one of first impression, and the court's additional research has disclosed nothing to indicate that it has arisen before.

The statutory development leading up to section 15(a) of the Fiduciaries Act is set forth in the notes of the commissioners who drafted the act, and in Kirk v. Van Horn et al., 265 Pa. 549 (1920). For nearly one hundred and fifty years, the trend has been consistently to reduce the period for which a decedent's debts remain a lien on his real estate, the Fiduciaries Act having reduced the initial period to one year after death. To extend the lien a further five years, three requirements were laid down: (1) An action to recover the debt must be brought against the personal representative; (2) the action must be indexed against the decedent and the personal representative in the judgment index in the county where the action is brought, and also in the county where the real estate is situate; (3) the action must be "duly prosecuted to judgment". The first two requirements are conditions precedent, and must be complied with before a year after decedent's death has expired. The third is a condition subsequent: sometime within the five years the action must be duly prosecuted to judgment in order to perfect the lien. Just when this must be done, has never been decided.

The amendment of 1919 to section 15(a) of the Fiduciaries Act provided an alternative to the third requirement. As originally enacted, it was not specified in so many words how the judgment should be obtained. By plain inference, however, the procedure is

the same as that in any other action in assumpsit. After the amendment, an award by the orphans' court in plaintiff's favor obviated the necessity of further proceedings in the common pleas because it amounted to compliance with the third requirement and perfected the creditor's lien. While no explanation of the reason behind the amendment is available, it seems obvious that it was to avoid the necessity of trying the merits of plaintiff's claim a second time, in the common pleas, where, as here, it had meanwhile been passed upon by the orphans' court, a court of competent jurisdiction.

It is to be noted that the amendment of 1919 went no further than to lay down an alternative to the theretofore prevailing method of due prosecution to judgment, which was, as pointed out, a requirement to perfect the lien.

To adopt claimant's contention it is necessary to conclude that the amendment did not only this, but intended to create a different kind of lien. As to the first two requirements mentioned, both are alike and they continue alike until claimant comes to choose between common pleas or orphans' court. If he chooses common pleas, and duly prosecutes to judgment there, he gets the 1917 variety of lien which is good only until six years after decedent's death and, to be continued thereafter, must be revived by scire facias within that time. If he chooses orphans' court, and obtains an award there, he gets the 1919 variety, which, like that before the Act of April 4, 1797, 3 Sm. L. 296, continues forever without revival. Such a construction is so contrary to the unbroken legislative policy of cutting down, as against enlarging, the lien period, that a court would be reluctant to adopt it other than as a last resort to rescue claimant from an otherwise unsolvable dilemma.

The failure of the Act of 1919 to provide specifically that a lien perfected by award of the orphans' court must be revived in order to continue for more than five years, and how it is to be done, is not an indication that

no revival is necessary but, instead, that the original provisions of section 15 (*a*) on this subject are intended to continue unchanged. Contra this view claimant argues that revival was impossible (in addition to being unnecessary), because the revival could be only in the common pleas, where there was no judgment; and further, that no statutory machinery exists for transferring such a judgment as is obtained in this court to the court of common pleas.

There are statutory provisions for transferring judgments of the orphans' court to the common pleas. The Fiduciaries Act, sec. 51 (*a*), requires prothonotaries to file and docket transcripts showing amounts due by fiduciaries, which then "shall constitute judgments, which shall be liens against the real estate of such fiduciary." The Orphans' Court Act of June 7, 1917, P. L. 363, sec. 18 (*e*) 1, provides similarly as to amounts which parties other than fiduciaries have been ordered to pay; and, in section 21 (*d*), for entering, docketing, and indexing verdicts or judgments resulting from jury trials in the orphans' court. The existence of such provisions for other cases lends force to claimant's argument that the absence of similar provisions for these cases compels the conclusion that there can be no transfer.

But is a transcript necessary here in order to obtain a judgment in the common pleas? Sections 51 (*a*) and 18 (*e*) of the Fiduciaries and Orphans' Court Acts, respectively, say that the transcripts "so filed, shall constitute judgments". In other words, there is no judgment in the common pleas until after the transcript has been duly filed. Section 15 (*a*) of the Fiduciaries Act says that the creditor's action "shall be deemed to have been duly prosecuted to judgment if award in favor of the plaintiff be made by . . . the orphans' court". In other words, the award in claimant's favor by this court was, without more, the equivalent to entry of judgment by confession, default, or on a verdict, in the common pleas.

True, after the award to claimant in the adjudication and after approval of the schedule of distribution including its claim there still was no record in the prothonotary's office to show that the lien had been perfected by compliance with the condition subsequent. That could be ascertained only by examining the records in the office of the clerk of this court. Yet there can be no doubt that the lien was perfected until six years after decedent's death. If, within that period, claimant had obtained and filed in the prothonotary's office an exemplification of the record in this court, and had then filed its præcipe for scire facias sur judgment, in an attempt to revive the judgment, could the prothonotary have refused to issue the writ for the reasons claimant asserts? We think not. By statute, the proceedings had in this court reduced claimant's action in assumpsit to judgment as effectually as anything claimant might have done in the common pleas. There already was a judgment existing, and the prothonotary could no more refuse to issue a scire facias to revive it than any other judgment existing by virtue of the other legislation. A peculiar and unusual kind of judgment, admittedly, but having been fathered by the legislature, it does not seem that the prothonotary can question its legitimacy. At least claimant might have tried to revive the judgment instead of doing nothing but rely on presumed impossibility.

Even if the foregoing conclusion as to what could have been done by way of revival is wrong, claimant might have proceeded to judgment in the usual way in the common pleas, by basing its action upon the judgment meanwhile rendered by this court. And even if neither of these would have succeeded, claimant had another remedy. Under section 16(b)2 of the Fiduciaries Act, claimant could have applied to this court for a direction to the executors to sell the real estate. Had such an application been made before the expiration of six years after decedent's death, any doubts as to

proper procedure to continue the lien further would have been avoided.

Innumerable decisions of the appellate courts have characterized the statutes restricting the duration of creditors' liens on a decedent's real estate as being not only statutes of limitation, but also of repose: Higgins' Estate, 325 Pa. 106, 111 (1937). It would be patently against this often-reiterated principle to hold, as claimant contends, that its lien endured indefinitely, without the necessity for further action after it was once perfected. The only reason for so holding would be as a last resort, because the law offered the creditor no other recourse to enforce his rights. Having found that claimant was not without remedies, we hold that there is no distinction in the duration of the lien of a decedent's debts on his real estate, whether the lien was perfected by being duly prosecuted to judgment "in the ordinary manner in the common pleas court," or by being "deemed to have been duly prosecuted to judgment" by an award in the creditor's favor by the orphans' court. In either case, the lien thus obtained expires after five years unless revived. The claim of Indemnity Insurance Company of North America to participate in the proceeds of the sale of real estate now before the court is therefore disallowed.

The third claim is that of the Board of Pensions of the Presbyterian Church in the U. S. A. for $2,282.80. The foreclosure of a $50,000 mortgage of decedent was mentioned above. This claimant was the mortgagee therein. The mortgage was dated April 11, 1930, and was secured upon premises known as nos. 28-30-32-34-36 East Lancaster Avenue, Ardmore, Lower Merion Township. These premises abutted on the southwest side of Lancaster Avenue and extended some 156 feet in depth. At the time of the mortgage, decedent owned other property, adjoining the mortgaged property on the rear thereof. Title to all was in decedent at his death.

In 1934 claimant foreclosed its mortgage and bought in the property at sheriff's sale. In 1936 accountants, with leave of court, sold the portion of the unmortgaged property farthest southwest from Lancaster Avenue, to pay lien creditors. The proceeds of that sale have been accounted for in the trustees' second account, which is adjudicated of even date herewith. The sale of the remaining property, situate between the mortgaged property and that sold in 1936, gave rise to the proceeds accounted for here.

When claimant foreclosed its mortgage there were no bids at the sheriff's sale, and claimant, as execution plaintiff, bought in the property for costs, as is customary in this county.

There was of record an assessment for county, township, and school tax purposes against premises described as "28-36 E. Lancaster Avenue", Ardmore, in the amount of $60,000 for each of the years 1932, 1933, 1934, and 1935. Not having been paid when due, taxes for 1932 were liened. On May 2, 1934, before the sheriff's sale upon the foreclosure proceedings, claimant paid $1,635.20 in satisfaction of the lien for 1932, and $1,247.10 in payment of 1933 taxes just prior to being liened. On July 13, 1934, after the sheriff's sale and after the sheriff's deed had been executed and acknowledged, claimant paid $1,334.10 for 1934 taxes, in full. On July 31, 1935, claimant paid $1,304.40 for 1935 taxes, in full.

In 1936, claimant discovered that the assessment of premises described as 28-36 E. Lancaster Avenue, Ardmore, included not only the premises upon which its mortgage was secured and of which it was then the owner, but also the two properties in rear thereof, which decedent had also owned. When this was brought to the attention of what are described as "the taxing authorities"—presumably the board for the assessment and revision of taxes—a change was made, as of January 1, 1936. Claimant's property was then as-

sessed for $50,000, and the two properties in rear thereof for $10,000: the property sold in 1936 at $1,-000, and that yielding the fund here accounted for, at $9,000.

Claimant computes its claim thus:

| | |
|---|---:|
| 1/6 of taxes for 1932, 1933, 1934, and 1935 | $920.13 |
| 5/6 of taxes for 1932 | 1,362.67 |
| | $2,282.80 |

The first item rests on the contention that one sixth of the total assessment represented real estate other than that securing claimant's mortgage, and hence that fraction of the taxes paid by claimant benefited the estate. The second item, whereby claimant seeks reimbursement for 1932 taxes in full, rests on the contention that accountants were in possession of the entire real estate during that year and collected rents therefrom, as shown by their first account. Interest is claimed from the dates of claimant's respective payments.

The assessments were not split until 1936, when this must have been done on the basis of the then values of the respective parcels. There is no evidence of record to show that the same proportions of the total assessment were proper in 1932. However, as there was no change in the total between 1932 and 1936, the assumption that the values of the component parts also remained constant appears justifiable.

Mortgagees are not always as vigilant as they should be in ascertaining the tax assessment status of their real estate security before trouble develops. As pointed out, claimant could have obtained the apportionment of the assessment as easily in 1932 as it was obtained in 1936. Notwithstanding that claimant's failure to discover and correct the assessor's error several years earlier was clearly due only to its own negligence, this negligence did not cause any loss to, or change of position on the part of, the estate.

The subrogation rights under which mortgagees have been permitted to recover taxes from owners of properties, and which have been discussed in a long line of recent cases beginning with Pennsylvania Company, etc., v. Bergson, 307 Pa. 44 (1932), all rest to a considerable extent on the compulsion upon the mortgagees to pay the taxes at the time of foreclosure. Here, of course, there was no compulsion on claimant to do more than pay taxes on the mortgaged property. Millard, Exec., et al. v. Delaware, Lackawanna & Western R. R. Co., 240 Pa. 234 (1913), cited by claimant, is distinguishable in that there the plaintiffs, suing to recover taxes which should have been paid by defendant, did try to have the assessment against them changed, and paid only when this failed and they risked seizure of their leasehold. Yet the payments claimant made were made in the mistaken belief that compulsion did exist, so that claimant cannot be characterized as a volunteer, and its acts as officious, so as to remove it outside the scope of subrogation.

Claimant also relies on the A. L. I. Restatement of Restitution, sec. 104b. This section is under chapter 3, wherein are included "situations in which coercion of various types exists." It would be applicable if claimant had been under a legal duty to pay the taxes, which we have seen was not so. However, section 43, under chapter 2 which covers "restitution because of a mistake in the conferring of a benefit", is in point in claimant's favor. This section was relied upon in Central Wisconsin Trust Co. v. Swenson et al., 222 Wis. 331, 267 N. W. 307 (1936) [there cited as section 38 of A. L. I. Restatement of Restitution Tentative Draft No. 1, to which section 43 of the official draft corresponds]. Under facts similar to this case, recovery of the taxes erroneously paid was allowed in an action in equity against the owner of the real estate. The payor's mistake was held sufficient to take it out of the volunteer class which is not entitled to equitable subrogation.

Although claimant may thus be entitled to subrogation, it remains to inquire into its right to share in this distribution of a fund which is available only to lien creditors. The line of cases headed by Pennsylvania Company, etc., v. Bergson, supra, represents enforcement of a landowner's personal liability for taxes by action in assumpsit. If claimant is subrogated only to the county's and municipality's rights to this, it will not permit recovery here. There is, however, authority that in such cases the mortgagee who pays taxes does so "not only in reliance on the personal liability of the owner, but in reliance that the land is liable, and the lien will be transferred by the State to him in favor of the mortgage-debt": DeHaven v. Roscon B. & L. Assn., 107 Pa. Superior Ct. 459, 460 (1933), quoting from Hogg v. Longstreth, 97 Pa. 255, 259 (1881). While here claimant was not mortgagee of the property on which it paid taxes by mistake, the principle of subrogation is the same as though it had been. Treating the tax liens which claimant erroneously discharged as having been, in equity, thereby transferred to claimant, it thereby becomes entitled as a lien creditor to restitution out of the fund for distribution.

The $920.13 paid by claimant for 1932, 1933, 1934, and 1935 taxes on property of decedent not covered by the mortgage includes both the second tract sold in 1936, the proceeds of which are the subject of the second account, and the third tract, sold in 1940 and accounted for here. Claimant depends for participation in this distribution on its lien by subrogation. Clearly, claimant never had a lien on this third tract for taxes paid on the second. Hence its claim must be restricted to that proportion of $920.13 which the assessment of this tract bears to the total of both. This tract having been assessed at $9,000, and the second at $1,000, when the apportionment was made in 1936, the proportion is nine tenths.

The claim of the Board of Pensions for 1932, 1933, 1934, and 1935 taxes on the real estate sold to produce

this fund is allowed in the sum of $827.12. Interest thereon is claimed from the dates of the respective payments. Under section 156 of the A. L. I. Restatement of Restitution, interest is payable from the time when a breach of duty to make restitution was committed. Under the facts here it is impossible to say when the duty to make restitution arose. Claimant did not discover its mistake until some unspecified time in 1936, and how soon thereafter accountants were made aware of it does not appear of record. Until then, there could be no possible duty to make restitution and hence interest could not begin to run. Furthermore, claimant delayed for more than four years to enforce its claim for restitution. But for the circumstances that the claim is now being enforced against the proceeds of the real estate itself, which required years to liquidate, claimant's recovery might well be barred by laches. To allow claimant interest at the legal rate, even if it could be computed with any degree of accuracy, would, over those years of low interest rates, amount to turning claimant's mistake into a nicely profitable investment. For these reasons all interest is disallowed.

The other portion of this claim, for the $1,362.67 balance of the five sixths of the 1932 taxes, is in a different position. The property involved was that subject to claimant's mortgage. If the claim for reimbursement be regarded as a claim in assumpsit, in enforcement of personal liability, it is barred by the statute of limitations, because payment was made on May 2, 1934, and the claim was made at the audit on December 11, 1940, and the statute begins to run from the time the mortgagee pays the taxes: Fidelity-Philadelphia Trust Co., Trustee, v. Bergson (No. 1), 328 Pa. 545 (1938). Even aside from the statute of limitations, we have seen that only lien creditors may participate in the fund for distribution, and in subrogation to the enforcement of personal liability claimant has no lien of any kind.

If the claim be regarded as in enforcement of the lien on the property on which the taxes were assessed, claimant is no nearer to success. Claimant's lien was on the mortgaged property. The lien arose, in claimant's favor, on May 2, 1934, when payment was made. On July 11, 1934, it acquired title to the real estate by sheriff's deed in consummation of the foreclosure proceedings, whereupon its rights as lien creditor became merged in the fee. Never, by any theory, did claimant have a lien on the property which gave rise to the proceeds now accounted for.

The portion of the claim for $1,362.67, with interest from May 2, 1934, is disallowed.

And now, July 25, 1941, this adjudication is confirmed nisi.